**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

**TARA NEFF,**                                    Case No. 5:18 CV 2492

      Plaintiff,

      v.                                    Magistrate Judge James R. Knepp II

**COMMISSIONER OF SOCIAL SECURITY,**

      Defendant.                          MEMORANDUM OPINION AND ORDER

## INTRODUCTION

Plaintiff Tara Neff ("Plaintiff") filed a Complaint against the Commissioner of Social Security ("Commissioner") seeking judicial review of the Commissioner's decision to deny supplemental security income ("SSI"). (Doc. 1). The district court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). The parties consented to the undersigned's exercise of jurisdiction in accordance with 28 U.S.C. § 636(c) and Civil Rule 73. (Doc. 11). For the reasons stated below, the undersigned affirms the decision of the Commissioner.

## PROCEDURAL BACKGROUND

Plaintiff filed for SSI in November 2015, alleging a disability onset date of January 1, 2009. (Tr. 156-61). Her claims were denied initially and upon reconsideration. (Tr. 92-94, 100-01). Plaintiff then requested a hearing before an administrative law judge ("ALJ"). (Tr. 105-06). Plaintiff (represented by counsel), and a vocational expert ("VE") testified at a hearing before the ALJ on January 18, 2018. (Tr. 34-63). On March 12, 2018, the ALJ found Plaintiff not disabled in a written decision. (Tr. 10-22). The Appeals Council denied Plaintiff's request for review, making the hearing decision the final decision of the Commissioner. (Tr. 1-3); *see* 20 C.F.R. §§ 416.1455, 416.1481. Plaintiff timely filed the instant action on October 29, 2018. (Doc. 1).

**FACTUAL BACKGROUND**[1]

Personal Background and Testimony

Born in 1980, Plaintiff was 37 years old at the time of the hearing. *See* Tr. 39. She last worked in 2008 as a childcare worker. (Tr. 49).

Plaintiff took medication for diabetes (Tr. 41), depression, anxiety, high blood pressure, cholesterol, migraines, asthma, thyroid problems, and back pain – all without side effects (Tr. 40).

Plaintiff also had difficulty breathing and used inhalers since childhood. (Tr. 41-42). Her breathing was worse with walking, running, cold weather, and exposure to cleaning chemicals. (Tr. 42). She also had "constant" lower back pain which radiated to her legs. *Id*. Pain medication did not help much and physical therapy did "not [go] well"; injections provided two weeks of relief. (Tr. 42-43). Plaintiff's back pain was worse with walking, running, bending, and sitting for long periods. (Tr. 43). She could walk "[a]bout 10, 20 minutes" at a time before needing to sit or lie down. *Id*. She could sit for "[a]bout a half hour" before needing to stand. (Tr. 43-44). The back pain affected Plaintiff's ability to sleep. (Tr. 44).

Plaintiff's problems with both knees (including sporadic pain) depended on her activity level. (Tr. 44-45). She had a stress fracture in her left foot which ached in the cold (Tr. 44), and numbness and shooting pain in her feet "once or twice a day" (Tr. 51).

Plaintiff was obese, weighing 417 pounds at 5'9" at the time of the hearing. (Tr. 39). She noted weight gain during the prior ten years, though she recently lost twenty pounds. (Tr. 50).

---

1. Although Plaintiff suffers from both physical and mental impairments, the arguments raised before this Court only implicate the former. *See* Doc. 12. As such, the undersigned summarizes only records and testimony related to Plaintiff's physical impairments. *See Kennedy v. Comm'r of Soc. Sec.*, 87 F. App'x 464, 466 (6th Cir. 2003) (arguments not raised in opening brief deemed waived).

Plaintiff lived alone. (Tr. 39, 47). In a typical day, she cared for her dog, bathed and dressed, did household chores, and watched television. (Tr. 47). She cooked, cleaned, and did her laundry at her aunt's home. *Id.* Plaintiff's aunt drove her to the store, church, and doctor's appointments. (Tr. 47-48). Plaintiff helped care for her ill mother who lived nearby; she vacuumed her mother's floors. (Tr. 48).

Relevant Medical Evidence

Plaintiff treated with pulmonary specialist Michael Dentler, M.D., in March 2016. (Tr. 244-46). She reported shortness of breath, wheezing, chest pain ("sharp" across the chest), chest tightening, a dry cough, and a history of asthma. (Tr. 244). She denied musculoskeletal pain, but reported a history of arthritis in her wrists, knees, fingers, elbows, and ankles. (Tr. 245). On examination, Dr. Dentler found Plaintiff's lungs clear to auscultation bilaterally; there were no wheezing, rales, or rhonchi present. *Id.* Dr. Dentler assessed moderate persistent asthma (without complication), allergic rhinitis, morbid obesity, and obstructive sleep apnea. *Id.*

The same day, Plaintiff treated with podiatrist Richard Rasper, D.P.M., for diabetic foot pain. (Tr. 247). She reported pain in her feet bilaterally (worse with walking), and that she walked on her outer ankles. *Id.* Plaintiff had numbness and tingling in her feet and difficulty wearing shoes. *Id.* Dr. Rasper noted Plaintiff had a normal gait, but decreased sensation ("characteristic of diabetic neuropathy") and paresthesias bilaterally. (Tr. 248). He diagnosed type 2 diabetes with diabetic polyneuropathy, prescribed a pain cream, and instructed Plaintiff to return in two weeks for a check-up and to discuss diabetic shoes. *Id.*

Results of a March 2016 pulmonary function test were within normal limits. (Tr. 345-48).

Plaintiff treated at the emergency room in June 2016 for left knee pain after she slipped and fell on wet cement. (Tr. 408). On examination, Plaintiff had abrasions and ecchymosis on the

left knee. (Tr. 410). She had an unremarkable respiratory (Tr. 409) and back (Tr. 410) examinations. Doctors diagnosed knee pain with a possible meniscus injury and ordered her to treat the pain with ibuprofen or Tylenol and follow up with her primary physician if necessary. (Tr. 410).

A July 2016 left knee MRI revealed a probable partial tear of the anterior cruciate ligament, a probable tear exiting the inferior articular margin of the posterior horn medical meniscus, and joint effusion. (Tr. 474). Plaintiff underwent a surgical repair in September 2016. (Tr. 452-53).

In October 2016, Plaintiff reported continued left foot pain to Dr. Rasper. (Tr. 558). On examination, Dr. Rasper noted "egg shaped" swelling over the fourth metatarsal on the left foot as well as decreased sensation and paresthesias bilaterally. (Tr. 559). He diagnosed a left foot stress fracture, cavovarus deformity, metatarsus adductus, tinea pedis, and in-toeing. *Id*. Dr. Rasper prescribed a left CAM walking boot and ordered x-rays. *Id*. Plaintiff remained in the CAM boot through November. *See* Tr. 551-52. In November, Dr. Rasper made similar findings on examination and instructed Plaintiff to wear the CAM boot for three more weeks. (Tr. 552).

Plaintiff began treating with Victoria Alexander, D.O., in November 2016. (Tr. 548). At her initial visit, Plaintiff reported cold symptoms. *Id*. She denied chest pain or shortness of breath (Tr. 549) and had a normal respiratory examination (Tr. 548). Dr. Alexander noted Plaintiff's (uncontrolled) diabetes diagnosis and prescribed additional diabetes mediations. (Tr. 548).

Plaintiff attended physical therapy for lumbar radicular pain, on referral from Dr. Alexander, from March to May 2017. *See* Tr. 689-706. Plaintiff reported continued lower back pain throughout her course of treatment, *see id*., with only one to one and a half hours of relief after each session (Tr. 692, 694). At her final visit, Plaintiff was noted to have made "little to no progress." (Tr. 690).

Plaintiff saw Dr. Alexander for left knee pain and swelling in April 2017. (Tr. 830). Plaintiff reported recently falling from a step; she believed her pain resulted from altering her gait as a result of the fall. *Id.* Dr. Alexander found Plaintiff's left knee tender to palpation with flexion and extension, but no joint laxity. (Tr. 831). Plaintiff denied wheezing and shortness of breath and had a normal respiratory examination. *Id.* Dr. Alexander diagnosed acute left knee pain and morbid obesity. (Tr. 831-32). She prescribed a knee brace and noted that Plaintiff's weight and altered gait were likely the cause of her knee pain. (Tr. 832).

In May 2017, Plaintiff reported persistent low back pain to Dr. Alexander. (Tr. 816). The pain radiated down both legs and did not improve with physical therapy. *Id.* Dr. Alexander noted increased paraspinal muscle tension in the lower back with positive straight leg raises bilaterally. (Tr. 817). Plaintiff again denied wheezing and shortness of breath and had an unremarkable respiratory examination. *Id.* Dr. Alexander diagnosed lumbar radicular pain, meralgia paresthetica of both lower extremities, and morbid obesity. *Id.* An MRI taken that month revealed a bulging disc at L3-L4 with facet and ligamentum hypertrophy resulting in stenosis in the lateral recesses. (Tr. 818).

Plaintiff established care with pain management specialist Syed Ali, M.D., in July 2017. (Tr. 937). She reported "constant" lower back pain, worse with sitting and improved with medication, heat, physical therapy, and walking. *Id.* On examination, Dr. Ali noted tenderness over the lumbar paraspinal muscles, facet pain, fair range of motion in the lumbar spine, and increased pain on extension and rotation; a straight leg raising test was negative. (Tr. 938). Plaintiff denied cough, shortness of breath, or wheezing (Tr. 939), and a pulmonary examination revealed no wheezes or labored breathing (Tr. 938). Dr. Ali diagnosed intervertebral disc displacement of the lumbar region, acute midline low back pain, radiculopathy, myalgia, chronic pain syndrome, and

obesity. (Tr. 938-39). He attributed Plaintiff's back pain "mainly" to her obesity and prescribed a lumbar epidural injection. (Tr. 939). Plaintiff had lumbar epidural injections in August and October 2017. *See* Tr. 900, 889.

Plaintiff's weight remained in excess of 400 pounds throughout 2016 and 2017. *See* Tr. 245, 248, 346, 471, 498, 548, 552, 559, 808, 817, 831, 938. Her physicians noted her obesity diagnosis. *See* Tr. 244, 549, 832, 939.

Opinion Evidence

*Treating Physician*

Dr. Alexander completed an "Obesity Medical Source Statement" in December 2016. (Tr. 952-54). She listed Plaintiff's diagnoses and treatment and noted Plaintiff was 68 inches tall and weighed 430 pounds. (Tr. 952). She opined Plaintiff could only lift/carry under five pounds and occasionally and frequently carry "very little" weight. *Id*. Plaintiff could stand/walk less than one hour of an eight-hour work day. *Id*. Dr. Alexander opined Plaintiff's ability to sit was affected by her obesity and she "must be permitted breaks" due to back pain. (Tr. 952-53). Plaintiff could never climb, balance, stoop, crouch, crawl, or kneel due to her obesity and back and neck pain. (Tr. 953). Plaintiff could rarely lift less than ten pounds, and never lift more. *Id*. She could never twist, stoop, crouch/squat, or climb ladders or stairs. *Id*. Dr. Alexander opined Plaintiff could use her arms 75% of the day for frontal reaching, and 50% of the day for overhead reaching. *Id*. Finally, Dr. Alexander opined Plaintiff would be "off task" 25% or more of her workday due to symptoms and would be absent more than four days per month due to impairments or treatment. (Tr. 954).

Dr. Alexander completed a work-related activities questionnaire in September 2017. (Tr. 955-56). She opined Plaintiff could lift less than ten pounds on a frequent and occasional basis. (Tr. 955). Plaintiff could stand/walk or sit for up to three hours each in an eight-hour workday in

half-hour increments. *Id.* Dr. Alexander continued the same postural limitations as her December 2016 opinion. *Compare* Tr. 953, *with* Tr. 955. She further opined Plaintiff's ability to tolerate environmental hazards was affected by her asthma and she could not tolerate vibration due to knee pain. (Tr. 955). Dr. Alexander concluded Plaintiff would miss more than four days of work per month due to pain or fatigue, and would need four or more unscheduled breaks during the day. (Tr. 956). During her workday, Plaintiff would be "off task" over 20% of the day and need to lie down for one and a half hours; she could use her hands 80% of the day. *Id.*

Dr. Alexander completed a "Diabetes Mellitus Medical Source Statement" in November 2017. (Tr. 957-58). She opined Plaintiff could stand/walk for thirty minutes total during an eight-hour workday and sit for a total of three hours during the day in half-hour increments. (Tr. 957). Dr. Alexander again opined Plaintiff could lift less than ten pounds; she could frequently and occasionally carry "very little" weight. *Id.* She further noted Plaintiff would need to take an unscheduled break every two hours. *Id.* She added that Plaintiff would not need to elevate her legs during the day, *id.*, and she did not require the use of an assistive device (Tr. 958). Plaintiff could use her hands, fingers, and arms (for both overhead and frontal reaching) 60% of an eight-hour workday. *Id.* She concluded Plaintiff needed to avoid even moderate exposure to extreme cold, and avoid all exposure to other environmental hazards. *Id.* Finally, Dr. Alexander stated Plaintiff would be "off task" 25% or more of her workday and would be absent four or more days per month due to impairments or treatment. *Id.*

*State Agency Physicians*

In May 2016, State agency physician Maureen Gallagher, D.O., reviewed Plaintiff's medical records and provided a physical residual functional capacity assessment. (Tr. 71-73). She opined Plaintiff could occasionally lift/carry twenty pounds and frequently lift/carry ten. (Tr. 72).

Plaintiff could stand and/or walk for a total of four hours (with normal breaks); she could sit for about six hours in an eight-hour workday (again, with normal breaks). *Id.* Plaintiff had an unlimited ability to push and/or pull. *Id.* She opined Plaintiff could occasionally climb ramps/stairs, balance, stoop, kneel, crouch, or crawl. (Tr. 72-73). She could never climb ladders, ropes, or scaffolds. (Tr. 72). Dr. Gallagher noted these postural restrictions were due to Plaintiff's morbid obesity. (Tr. 73). She concluded Plaintiff was unlimited in her ability to tolerate environmental exposures; she needed to avoid hazards such as machinery and heights. (Tr. 73). Esberdado Villanueva, M.D., affirmed these conclusions in July 2016. *See* Tr. 85-87.

VE Testimony

A VE appeared and testified at the hearing before the ALJ. *See* Tr. 55-62. The ALJ asked the VE to consider a person with Plaintiff's age, education, and vocational background who was limited in the way in which the ALJ determined Plaintiff to be. *See* Tr. 56-57. The VE opined such an individual could not perform Plaintiff's past work, but could perform other jobs such as a scanner operator, addresser, or a table worker. (Tr. 57-58).

ALJ Decision

In a written decision dated March 12, 2018, the ALJ found Plaintiff had not engaged in substantial gainful activity since her application date (November 10, 2015). (Tr. 12). He concluded Plaintiff had severe impairments of: diabetes mellitus, peripheral neuropathy, asthma, lumbar degenerative disc disease, degenerative joint disease of the knees, obesity, major depression, and generalized anxiety disorder, but found these impairments (alone or in combination) did not meet or medically equal the severity of a listed impairment. (Tr. 12-13). The ALJ then found Plaintiff had the residual functional capacity ("RFC"):

> to perform sedentary work as defined in 20 CFR 416.967(a) with certain
> restrictions. Specifically, the claimant can never climb ladders, ropes or scaffolds

but can occasionally climb ramps and stairs. She can occasionally stoop and crouch. She can never kneel or crawl. She must avoid concentrated exposure to dusts, fumes and gas[s]es. She must avoid workplace hazards such as unprotected heights or exposure to dangerous moving machinery. The claimant is able to perform simple routine tasks that do not involve arbitration, negotiation or confrontation. She cannot perform tasks involving directing the work of others or being responsible for the safety or welfare of others. She cannot perform piece rate work or assembly line work. She can have occasional interaction with others.

(Tr. 15). The ALJ found Plaintiff was unable to perform past relevant work. (Tr. 20). She was "a younger individual" on the application date and had at least a high school education. *Id*. The ALJ concluded that, considering Plaintiff's age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that Plaintiff could perform. *Id*. Thus, the ALJ found Plaintiff not disabled from the application date through the date of the decision. (Tr. 22).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn

"so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

**STANDARD FOR DISABILITY**

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process—found at 20 C.F.R. § 416.920—to determine if a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?

2. Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's residual functional capacity and can claimant perform past relevant work?

5. Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters*, 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The ALJ considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and

meets the duration requirements, is she determined to be disabled. 20 C.F.R. § 416.920(b)-(f); *see also Walters*, 127 F.3d at 529.

DISCUSSION

Plaintiff alleges the ALJ failed to properly evaluate: (1) her obesity in accordance with Social Security Ruling 02-1p; (2) her subjective symptoms; and (3) her treating physician Dr. Alexander's medical opinions. (Doc. 12, at 15-25). The Commissioner responds that the ALJ's decision is supported in each regard and should be affirmed. For the following reasons the undersigned agrees and affirms the decision of the Commissioner.

Obesity

Obesity is defined as "a complex, chronic disease characterized by excessive accumulation of body fat." SSR 02-1p, 2002 WL 34686281, at *2. When establishing the existence of obesity, the ALJ will "rely on the judgment of a physician who has examined the claimant and reported his or her appearance and build, as well as weight and height." *Id.* at *3. Although obesity is no longer considered a listed impairment, it is considered a medical impairment, so it must be considered at each step of the ALJ's analysis. *Id.* at *1; *see also Miller v. Comm'r of Soc. Sec.*, 811 F.3d 825, 834 (6th Cir. 2016). This is because "the combined effects of obesity with other impairments can be greater than the effects of each of the impairments considered separately." SSR 02-1p, 2002 WL 34686281, at *1. Specifically, the ALJ must consider "the effect obesity has upon the individual's ability to perform routine movement and necessary physical activity within the work environment" and an individual's ability to sustain a function over time when formulating the RFC. *Id.* at *6.

However, the "ALJ is not required to use any 'particular mode of analysis' in assessing the effect of obesity." *Shilo v. Comm'r of Soc. Sec.*, 600 F. App'x 956, 959 (6th Cir. 2015) (quoting

*Bledsoe v. Barnhart*, 165 F. App'x 408, 411-12 (6th Cir. 2006)). "[T]he ALJ does not need to make specific mention of obesity if he credits an expert's report that considers obesity." *Bledsoe*, 165 F. App'x at 412. If all of the evidence the ALJ relies on considers the claimant's obesity, then the ALJ will have satisfied the regulations. *See Caldwell v. Berryhill*, 2017 WL 957538, at *6 (E.D. Ky.) (upholding ALJ's decision, in part, because Plaintiff did not identify any additional limitations that should have been incorporated and ALJ considered medical evidence that took obesity into consideration).

Here, the ALJ expressly considered Plaintiff's obesity at Steps Two, Three, and Four of the sequential evaluation:

> After a review of the evidence I find that the claimant's physical impairments, considered either singly or in combination, significantly limit her ability to perform basic work activities, as required by SSR 85-28. Such analysis includes the consideration of the claimant's obesity as well. While obesity is no longer a listed impairment, I am nonetheless required to consider obesity in determining whether a claimant has medically determinable impairments that are severe, whether those impairments meet or equal a listing, and finally in determining the residual functional capacity. Social Security Ruling 02-01 also addresses the impact obesity may have on other impairments. I have considered this ruling and the claimant's obesity in determining the [e]ffect it has on her exertional and non-exertional abilities and find it more than minimally limits the claimant's ability to engage in work activity.

> Therefore, the claimant has established the physical impairments listed above, coupled with the obesity, as severe.

> * * *

> Although obesity is no longer a listing impairment (former listings 9.09 and 10.10 have been eliminated), Social Security Ruling 02-01 provides important guidance on evaluating obesity in disability claims. As set forth in SSR 02-01, I have considered how the claimant's obesity has affected her other impairments and whether those impairments, in combination with obesity, meet or equal a listing.

> * * *

> Finally, as noted throughout the discussion above, the claimant is also obese, which further complicates the symptoms of her other conditions. Given the claimant's

height of about 68 inches and weight documented as high as 433 pounds, she has had a Body Mass Index (BMI) of 65.83 (Ex 12F:24; *see also* 13F:1). She has been referred for bariatric surgery, however, has not yet undergone such treatment. Established medical guidelines for determining obesity in adults provide that a BMI of 30 or above is "obese" (National Institutes of Health (NIH), Clinical Guidelines on Identification, Evaluation, and Treatment of Overweight and Obesity in Adults (NIH Publication No. 98-4083, September 1998). Obesity is often associated with respiratory and musculoskeletal impairments, and can negatively impact all impairments. Thus, when obesity is combined with other impairments it can result in greater limitations on an individual. In determining the residual functional capacity set forth above, I have considered the claimant's obesity pursuant to SSR 02-1p and addressed its added impact on the claimant.

(Tr. 12-13, 18).

With this explanation, the ALJ made clear he considered Plaintiff's obesity as required by SSR 02-1p. He "considered this ruling . . . in determining the affect it has on her exertional and non-exertional abilities and [found] it more than minimally limits the claimant's ability to engage in work activity." (Tr. 13). In so considering, the ALJ accommodated Plaintiff's asthma and musculoskeletal impairments by limiting Plaintiff to sedentary work with additional postural and environmental limitations. (Tr. 15) ("the claimant can never climb ladders, ropes or scaffolds but can occasionally climb ramps and stairs. She can occasionally stoop and crouch. She can never kneel or crawl. She must avoid concentrated exposure to dusts, fumes and gasses. She must avoid workplace hazards such as unprotected heights or exposure to dangerous moving machinery.").

Plaintiff asserts that her obesity resulted in a stress fracture of her foot and shortness of breath and each should have been taken into consideration by the ALJ. (Doc. 12, at 17). However, the ALJ expressly considered these impairments and his conclusions are supported by the record. *See* Tr. 17 ("[H]er increased [knee] pain was likely due to a combination of her obesity and a recent foot injury."); Tr. 17 ("While even at that time the claimant reported some shortness of breath with activity, she also stated that she did not feel limited by her asthma symptoms."). And, as the Commissioner points out, Plaintiff does not identify any specific additional functional limitations

related to these impairments (or to her obesity) which she believes should have been included in the RFC. (Doc. 15, at 9); *see May v. Astrue*, 2011 WL 3490186, at *6 (N.D. Ohio), *report and recommendation adopted*, 2011 WL3490229; *see also Caldwell*, 2017 WL 957538, at *6 (finding Plaintiff failed to show the RFC was unsupported because he "ha[d] not identified any additional limitations that should have been incorporated because of his obesity, but were not"). Moreover, the ALJ gave "some weight" to the State agency physicians who expressly considered Plaintiff's obesity when making their determinations. (Tr. 19) (ALJ opinion); *see also* Tr. 72, 86 (State agency opinions). And, as noted, "the ALJ does not need to make specific mention of obesity if [s]he credits an expert's report that considers obesity." *Bledsoe*, 165 F. App'x at 412.

For these reasons, the undersigned finds no error here and concludes the ALJ satisfied the requirements of SSR 02-1p.

Subjective Symptom Analysis

Plaintiff next argues the ALJ's assessment of her subjective symptoms is not supported by substantial evidence. Specifically, she notes that the ALJ erred by only providing the "boiler plate" subjective symptom analysis in his decision. For the following reasons, the undersigned disagrees and affirms the Commissioner's decision in this regard.

When a claimant alleges impairment-related symptoms, the Commissioner follows a two-step process to evaluate those symptoms. 20 C.F.R. § 416.929(a); SSR 16-3p, 2017 WL 5180304, *2-8.[2] First, the ALJ must determine whether there is an underlying medically determinable

2. SSR 16-3p replaces SSR 96-7p and applies to ALJ decisions on or after March 28, 2016. *See* 2017 WL 5180304, at *1, 13. The ALJ's decision here is dated March 12, 2018 and thus SSR 16-3p applies. SSR 16-3p clarifies the language of the pre-existing standard in SSR 96-7p, 1996 WL 374186 (1996) to the extent that it "eliminated the use of the term 'credibility' in the sub-regulatory policy and stressed that when evaluating a claimant's symptoms the adjudicator will not 'assess an individual's overall character or truthfulness' but instead 'focus on whether the evidence establishes a medically determinable impairment that could reasonably be expected to produce the

physical or mental impairment that could reasonably be expected to produce the claimant's symptoms, *e.g.*, pain. SSR 16-3p, 2017 WL 5180304, *3-4. Second, the ALJ must evaluate the intensity and persistence of the claimant's symptoms to determine the extent to which those symptoms limit the claimant's ability to perform work-related activities. *Id.* at *3, 5-8. To evaluate a claimant's subjective symptoms, an ALJ considers the claimant's complaints along with the objective medical evidence, information from medical and non-medical sources, treatment received, and other evidence. *Id.* at *5-8. In addition to this evidence, the ALJ must consider the factors set forth in 20 C.F.R. § 416.929(c)(3). *Id.* at *7-8. Those factors include daily activities; location, duration, frequency, and intensity of pain or other symptoms; factors that precipitate and aggravate the symptoms; type, dosage, effectiveness, and side effects of any medication taken to alleviate pain or other symptoms; treatment, other than medication for relief of pain or other symptoms; measures other than treatment a claimant uses to relieve pain or other symptoms, *e.g.*, lying flat on one's back; and any other factors pertaining to a claimant's functional limitations and restrictions due to pain or other symptoms. 20 C.F.R. § 416.929(c)(3). Although the ALJ must "consider" the listed factors, there is no requirement that he discuss every factor. *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 287 (6th Cir. 2009).

The Sixth Circuit has explained, interpreting SSR 96-7p, the precursor ruling, that "an administrative law judge's credibility findings are virtually unchallengeable". *Ritchie v. Comm'r of Soc. Sec.*, 540 F. App'x 508, 511 (6th Cir. 2013) (internal citation omitted). Nevertheless, the ALJ's decision "must contain specific reasons for the weight given to the individual's symptoms,

---

individual's symptoms and given the adjudicator's evaluation of the individual symptoms, whether the intensity and persistence of the symptoms limit the individual's ability to perform work-related activities...." *Huigens v. Soc. Sec. Admin.*, 718 F. App'x 841, 848 (11th Cir. 2017) (quoting *Hargress v. Soc. Sec. Admin.*, 874 F.3d 1284, 1289-90 (11th Cir. 2017) (quoting in part SSR 16-3p)). Both rulings refer to the two-step process in 20 C.F.R. § 416.929(c).

be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." SSR 16-3p, 2017 WL 5180304, at *10.

Here, the ALJ correctly identified the two-step process (Tr. 15-16), summarized Plaintiff's testimony (Tr. 16), and offered his assessment of her subjective physical symptoms:

> After careful consideration of the evidence, I find that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision.

(Tr. 16). The ALJ then summarized Plaintiff's medical records (Tr. 17-20), and provided further explanation:

> Overall I find that the claimant does in fact experience work-related limitations due to her severe impairments. However, the alleged degree of her limitations is not supported by the medical evidence of record nor the overall weight of the record, including the claimant's wide range of daily and independent activities. The claimant is able to perform sedentary work as it addresses her difficulties with standing and walking due to her low back pain that radiates to her legs, her neuropathy, her knee pain, as well as her obesity. These conditions further limit her postural abilities as well. The claimant's asthma also complicates her ability to walk prolonged periods as well as limits her ability to work in certain environmental conditions. ***

> The medical record shows an overall conservative course of treatment regarding both the claimant's physical and psychological conditions and no indication of disabling findings. While the combined effect of the claimant's conditions, including the obesity, cause her greater limitation than her individual conditions, this is addressed by limiting her to a sedentary level of exertion with additional postural limitations.

(Tr. 20).

The undersigned finds this explanation covers many of the factors required under the regulations and the ALJ's rationale is supported by substantial evidence. 20 C.F.R. § 416.929(c).

Of note, the ALJ considered Plaintiff's "wide range of daily and independent activities" in assessing her credibility. (Tr. 20); *see also* 20 C.F.R. § 416.929(c)(3)(i) (daily activities as a factor

the adjudicator must consider). These activities are supported by Plaintiff's own testimony. *See* Tr. 39 (she lived alone); Tr. 47 (in a typical day, she cared for her dog, bathed and dressed, did household chores (like cooking and cleaning), watched television, and did laundry at her aunt's home); Tr. 48 (she helped care for her ill mother). The ALJ also considered Plaintiff's "overall conservative course of treatment" regarding her physical conditions. (Tr. 20). This reason contemplates an additional regulatory factor, 20 C.F.R. 416.929(c)(3)(v) ("Treatment, other than medication, you receive or have received for relief of your pain or other symptoms."), and is supported by substantial evidence. For example, the ALJ noted Plaintiff's diabetes was treated with medication (Tr. 17), and her back pain was mainly treated with medication and injections (Tr. 16). *See* Tr. 548, 816, 830 (Dr. Alexander addressing Plaintiff's diabetes medications); Tr. 900, 939, 989 (lumbar injections). The ALJ also reasonably found Plaintiff's asthma was well-controlled with inhalers and her symptoms stable. (Tr. 17-18); *see* Tr. 245, 409, 548, 817, 831, 938 (unremarkable respiratory examinations); Tr. 347-48 (results of pulmonary function test within normal limits); Tr. 549, 817, 841, 939 (Plaintiff denied shortness of breath). Conservative treatment is a valid reason to discount Plaintiff's claims of disabling symptoms. *Tweedle v. Comm'r of Soc. Sec.*, 731 F. App'x 506, 508 (6th Cir. 2018) ("[T]he ALJ appropriately considered Tweedle's conservative treatment history in discounting his claim of disabling pain."); *see also Dinkins v. Comm'r of Soc. Sec.*, 2014 WL 1270587, at *11 (N.D. Ohio) (classifying as "conservative" treatment measures including narcotic pain relievers, anti-inflammatory medications, and neurological medications).

Plaintiff argues the ALJ's rationale is inadequate as it does not go far enough beyond the impermissible "boiler plate" credibility determination. (Doc. 12, at 20). However, this is only error when an ALJ fails to provide analysis elsewhere in his opinion. *Forrest v. Comm'r of Soc. Sec.,*

591 F. App'x 359, 366 (6th Cir. 2014) (finding no error where an ALJ made the "boilerplate" credibility finding but provided a thorough explanation elsewhere in the opinion). And, as quoted above, the ALJ went well beyond a bare bones explanation later in his decision and his findings are supported by substantial evidence. *See* Tr. 20. He touched on several of the regulatory factors and, as noted, although the ALJ must "consider" the listed factors, there is no requirement that he *discuss* every factor. *White*, 572 F.3d at 287. Moreover, the ALJ's explanation was articulated in such a way that "any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." SSR 16-3p, 2017 WL 5180304, at *10. For these reasons, the undersigned finds no error and affirms.

Treating Physician

Finally, Plaintiff alleges the ALJ erred in failing to give controlling weight to Dr. Alexander's opinions. She specifically argues that the ALJ's reasons for discounting the opinions are unsupported. For the following reasons, the undersigned affirms.

Generally, medical opinions of treating physicians are accorded greater deference than non-treating physicians.[3] *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007); *see also* SSR 96–2p, 1996 WL 374188. "Because treating physicians are 'the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairments and may bring a unique perspective to the medical evidence that cannot be obtained from the objective

---

3. Although recent revisions to the CFR have changed the rules regarding evaluation of treating physician opinions, such changes apply to claims filed after March 27, 2017, and do not apply to claims filed prior to that date. *See* Social Sec. Admin., *Revisions to Rules Regarding the Evaluation of Medical Evidence*, 82 Fed. Reg. 5852-53, 2017 WL 168819.

medical findings alone,' their opinions are generally accorded more weight than those of non-treating physicians." *Rogers*, 486 F.3d at 242 (quoting 20 C.F.R. § 416.927(d)(2))

A treating physician's opinion is given "controlling weight" if it is supported by: (1) medically acceptable clinical and laboratory diagnostic techniques; and (2) is not inconsistent with other substantial evidence in the case record. *Id.* (citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004)).

Importantly, when the physician's medical opinion is not granted controlling weight, the ALJ must give "good reasons" for the weight given to the opinion. *Id.* (quoting 20 C.F.R. § 416.927(d)(2)). These reasons must be "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Wilson*, 378 F.3d at 544 (quoting SSR 96-2p, 1996 WL 374188, at *5). When determining weight and articulating "good reasons", the ALJ "must apply certain factors" to the opinion. *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 660 (6th Cir. 2009) (citing 20 C.F.R. § 404.1527(d)(2)). These factors include the length of treatment relationship, the frequency of examination, the nature and extent of the treatment relationship, the supportability of the opinion, the consistency of the opinion with the record as a whole, and the specialization of the treating source. *Id.* While an ALJ is required to delineate good reasons, he is not required to enter into an in-depth or "exhaustive factor-by-factor analysis" to satisfy the requirement. *Francis v. Comm'r Soc. Sec. Admin.*, 414 F. App'x 802, 804-05 (6th Cir. 2011).

In evaluating Dr. Alexander's opinions, the ALJ explained:

I give little weight to Dr. Alexander's opinion statements as they overstate the claimant's limitations. Dr. Alexander's treatment notes, as well as all treatment notes in the record, consist of no more than conservative care for the claimant's impairments. Furthermore, the claimant's daily activities throughout the relevant period indicate a significant[ly] greater capacity than opined by the physician. The claimant lives independently without significant limitation, has traveled out of state

during the relevant period (2015), and significantly helps her mother who lives three doors down. There is nothing in the medical record to suggest that the claimant is so limited as to not even be able to perform a sedentary job or any postural activity at all. Furthermore, the doctor opined some level of restriction of the claimant's upper extremities; however, treatment notes fail to support this limitation as there is no treatment sought for the claimant's upper extremities. Thus, while Dr. Alexander is a treating source whose opinion is potentially entitled to controlling weight, as this opinion is not supported by the doctor's own treatment notes nor is the opinion consistent with the overall weight of the record, I assign it only little weight and not controlling weight.

(Tr. 18-19). Here, the ALJ declined to assign controlling weight to Dr. Alexander's opinions because they were unsupported by her own treatment notes and inconsistent with the overall weight of the record *Id.* The undersigned finds these are "good reasons" to discount Dr. Alexander's opinions as they directly implicate the factors of consistency and supportability under the regulations. *Rabbers*, 582 F.3d at 660; 20 C.F.R. § 416.927(c)(4) ("Generally, the more consistent a medical opinion is with the record as a whole, the more weight we will give to that medical opinion."). In support, the ALJ concluded Dr. Alexander's opinions were inconsistent with Plaintiff's activities of daily living. (Tr. 18). This is supported by Plaintiff's own testimony. *See* Tr. 39 (Plaintiff lived alone); Tr. 47 (in a typical day, she cared for her dog, bathed and dressed, did household chores (like cooking and cleaning) and watched television); Tr. 47 (she did laundry at her aunt's home); Tr. 48 (she helped care for her ill mother). *See Mueller v. Comm'r of Soc. Sec.*, 683 F. App'x 365, 366 (6th Cir. 2017) (finding, *inter alia*, inconsistency between treating physician opinion and claimant's daily activities a good reason to discount a physician's opinion). The ALJ provided another "good reason" when he found Dr. Alexander's opinions were inconsistent with the conservative nature of Plaintiff's treatments – reflected both in her notes and the notes of other providers. As noted above, this is supported by the fact that Plaintiff's diabetes was treated with medication (Tr. 548, 816, 830) (Dr. Alexander noting Plaintiff's diabetes medications), her back pain was mainly treated with medication and

injections (Tr. 900, 939, 989) (lumbar injections), and her asthma was well controlled with inhalers as her symptoms largely remained stable (Tr. 489, 548, 831) (unremarkable respiratory examinations); (Tr. 347-48) (pulmonary function test showing Plaintiff's results within normal limits). *Kepke v. Comm'r of Soc. Sec.*, 636 F. App'x 625, 631 (6th Cir. 2016) ('The ALJ noted that the records indicate Kepke received only conservative treatment for her ailments, a fact which constitutes a "good reason" for discounting a treating source opinion."). Finally, the ALJ cited to what was notably *absent* from the record – treatment notes supporting Plaintiff had any limitation in her upper extremities such to support the significant limitations opined by Dr. Alexander. Supportability is another regulatory factor an ALJ must consider when assigning weight to a source. 20 C.F.R. § 416.927(c)(3) ("The more a medical source presents relevant evidence to support a medical opinion, particularly medical signs and laboratory findings, the more weight we will give that medical opinion."). Taken together, the undersigned finds these reasons given by the ALJ are more than adequate to satisfy his regulatory burden.

Though Plaintiff points to evidence suggesting a contrary conclusion, "[a]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision." *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (quoting *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)). The substantial-evidence standard "presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts." *Id*. Thus, because the ALJ provided the required "good reasons" for discounting Dr. Alexander's opinions and those given reasons are supported by substantial evidence, the undersigned must affirm.

## CONCLUSION

Following review of the arguments presented, the record, and the applicable law, the undersigned finds the Commissioner's decision denying SSI supported by substantial evidence and affirms that decision.

 s/ James R. Knepp II
United States Magistrate Judge